Ranney, J.
On tbe 8tb day of October, 1853, tbe plaintiff gave to tbe defendant, Charles H. Bolles, bis negotiable promissory note for tbe sum of $5370, and payable two years after date, witb interest. Prior to tbe 14tb of December, in tbe same year, sundry payments bad been made and indorsed tbereon, leaving then due tbe sum of $2500; and on that day, tbe plaintiff executed and delivered a mortgage upon real estate situated in Lorain county to secure this balance. On tbe 9th of June, 1856, be filed his amended petition against Bolles, tbe original payee of tbe note — Kendall and Lucas, through whose bands tbe note and mortgage bad passed by assignment, and Smith, tbe then bolder — to compel tbe delivery and cancellation of these instruments; alleging that tbe note was given for a pretended patent right for a machine, which was utterly worthless, whether patented or not; that both tbe note and mortgage were obtained by fraud; and that every subsequent bolder thereof took them witb full notice of tbe fraud and want of consideration.
*397 Smith alone answered the petition, and claimed to have purchased the note and mortgage from Lucas, shortly before they fell due, without notice of any fraud or want of consideration, and to be a Iona fide holder thereof for value, and entitled to be protected as such.
No bill of exceptions, embodying the evidence, having been taken upon the trial in the court below, we have only to consider whether the facts found by the court, justified the judgment which was rendered. If any state of the evidence, consistent with the pleadings, would justify the findings of fact, which the court made, we are bound to presume, in support of the judgment, that such evidence was given. Ide v. Churchill, ante,p. 372.
The plaintiff obtained the relief demanded in his petition for everything beyond the amount paid by Smith for the note and mortgage, with interest thereon;' and for that amount, an affirmative judgment for the sale of the mortgaged premises was rendered in favor of Smith, and the plaintiff was ordered to pay the costs of the action.
This judgment was founded upon a finding by the court, that the note was obtained by fraud, and without consideration, of which the intermediate parties, Kendall and Lucas, had notice, and that, as against them, and Bolles, the plaintiff was entitled to the relief prayed for in his petition; but the court further find, that Smith purchased the note and mortgage from Luceis in September, 1855, and paid therefor $1250, without knowledge of the fraud and want of consideration existing between the original parties, and is entitled to hold the mortgage for the sum so paid with interest, and to recover thereon for ..that amount. Passing by, without any remark, the objection that this affirmative judgment in favor of Smith, could not have been rendered without a distinct counterclaim interposed by him, and coming, at once, to the merits of the controversy, it is evident, that the judgment can only be supported upon the estalishment of the two propositions: first, that upon the facts found by the court, taken in connection with his answer asserting his title, the defendant, Smith, in the sense of the commercial rule, was a bona fide holder of the *398 note, without notice of the equities existing between the original parties ; and, second, that the immunity belonging to the note in the hands of such a holder, in virtue of this rule, is extended to the mortgage by which it was originally secured, and equally entitles the holder to recover upon that.
A sum of money due upon the note, from Baily to Smith, is an indispensable predicate upon which to found a judgment upon the mortgage; and as no personal judgment was rendered or attempted, and as both note and mortgage, until they came to the hands of Smith, are found to have been fraudulent and void — it is equally evident, that he can sustain his judgment only upon the assumption that the attributes of negotiability belonged to the mortgage as well as the note, and, if this can not be done, that the finding upon the note, falls with the judgment rendered upon the mortgage. Without such finding, there can be no such judgment; and with the finding, there, still, can be no judgment, if Smith only succeeded to the rights of his assignor in the mortgage.
1. The court has found, úpon evidence not before us, but which we are bound to presume was satisfactory and sufficient, that Smith purchased without notice of the fraud, and for a valuable consideration paid at the time. But, as no proof could have been legally given, contradictory of the statements of his answer, it is readily conceded, that no presumption can be indulged, that a better title was proved than is therein set forth. In this answer he says, that “he bought said note and mortgage of said Lucas, before the maturity of said note, in good faith. That said Lucas claimed to be hard up for some money; that he represented said note and mortgage to be good, and the amount due on the note well secured; that he (respondent) was unacquainted with the maker of the note, with the value of the security, or circumstances under which the note was made or put into circulation, or what the consideration was. That he then lived in New York. The maker of the note and security for payment were a great way from him, and he was unwilling to give said Lucas, who was pressing him to buy the note, the use of more money than he then had, and which he pretended he wanted very much. He says *399 fcbat under these circumstances, in good faith, relying upon the representations of said Lucas that it was all right, he bought said note and mortgage of said Lucas for $1250,” and that he now owns the note.
Upon these statements, and the findings of the court, the ’ plaintiff’s counsel insist, that Smith was not a bona fide holder of the note, because,
First, He took it upon an usurious consideration;
Second, He is not a holder for value, in the legal sense; the term value, in its strict legal sense, meaning full value;
Third, He did not take or receive the note in the usual course of his business; and,
Fourth, According to his own answer, he received the note under circumstances of the greatest possible suspicion.
Very much of the argument advanced in support of these positions, proceeds upon the supposition that this court is at liberty to act upon the facts and circumstances attending this purchase, so far as they are disclosed in the answer, and draw the proper inferences from them. This is a very clear misapprehension of our powers and duties. No foundation whatever has been laid for reviewing the case upon the evidence, whether derived from the answer, or aliunde, or both; and we can only apply the law to the facts put in issue, and found in the court below.
A large part of the statements of this answér, are made up of mere evidence, tending more or less to support the averment, that he took, the note bona fide, and without notice. These statements, with such other evidence consistent with them, as he saw fit to give, and such as the plaintiff saw fit to give to controvert both, constituted the body of evidence which was submitted to the court below. What circumstances this evidence established, and what inferences might be drawn from the circumstances, it was the legitimate province of the triers of the facts to determine; and no reviewing court, without the whole evidence before it, could determine whether this duty was properly performed or not; nor, unless a case was made for reviewing the facts, would it possess the power to inter fere, in the slightest degree, with the exercise of either branch *400 of this important function. Non constat that it was not shown that the note was taken in the usual course of business, or that the circumstances of suspicion were not entirely explained by the other evidence in the case; or, if we could assume that the evidence was not sufficient for either purpose, yet, it would be but an error in finding the facts, and could not be reached by us in the actual posture of the case. The first two positions, however, stand on different ground, and arise out of the findings of the court, as well as the statements of the answer. It is said, that the contract of purchase was usurious, because the full face of the note was not paid for it; and that, for the same reason, Smith is not a holder for value, in the sense of the commercial rule — that rule requiring the holder to part with a consideration, equal to the face of the paper.
This purchase was made in New York, where, as we know, a strict usury law prevails; and, if it properly applies to this transaction, we should quite agree with the remark of Cowan, J., in Ramsdall v. Morgan, 16 Wend. Rep. 574, that-“there is a solicism on the face of the expression, a bona fide purchaser on usury.” But the argument, carried to its legitimate consequences, would make every absolute purchase of an existing security for less than its face, made in that state, void for usury. A complete answer to this position is found in the fact, that the statutes of that state against usury have no application whatever to the sale of choses in action, either negotiable or otherwise, and extend only to the “ loan or forbearance of any money, goods, or things in action.” 1 Rev. Stat. 772, sec. 2. This has been so often held, as to make it impracticable to cite the numerous cases in which the ruling has been made. But see Thomas v. Fish, 9 Paige, 478; Brooks v. Avery, 4 Com. Rep. 225; Bull v. Rice, 5 Seld. Rep. 315. A loan in reality, however, is very often disguised under the form of a sale; and in one class of cases, the courts have gone to great lengths in holding the transaction to be a loan, when the person taking the paper had no thought of being anything else than a bona fide purchaser. A series of cases, extending from Munn v. Commission Co., 15 J. R. 55, to Clark v. Sis- *401 son, 22 N. Y. 312, have established the proposition, that a bill or note, perfect on its face, delivered by the maker, acceptor or other party, to a third person, to enable him to raise money upon it, has no legal inception until it is negotiated by him, and if sold at a greater discount than the legal rate of interest,, to one having no notice that it was given for accommodation, and believing it to be business paper, is, nevertheless, void for usury in the hands of the purchaser. Powell v. Waters, 8 Cow. Rep. 669; Catlin v. Gunter, 1 Kern. 368; Acby v. Rapelge, 1 Hill, 9; Dowe v. Schutt, 2 Denio’s Rep. 621; Hall v. Wilson, 16 Barb. 548; Bossange v. Ross, 29 Barb. 576.
It is very true, that the judges have often said, that the paper must be “ perfect and available ” to the original holder, to warrant a sale at a greater discount than seven per cent. ;- which it would be somewhat difficult to say of a note voidable for fraud; but we can not find that the principle has ever been extended to such a case; and, restraining this language to the actual cases in which it was used, we are satisfied that the distinction is, between paper intended by the original parties to have immediate effect, and to be perfect and complete (whether a defense against it may exist or not), and paper left by them inchoate and imperfect, and intended to have effect only when some third party should advance' the consideration upon it. In the one case the paper has an existence, and the very existence intended by the parties, whatever may be its imperfections; while in the other, it is, in legal effect, in the hands of the maker or acceptor, until it has been used in the manner contemplated by him.
There is another class of cases, resting upon very satisfactory grounds, in which the defense of usury has uniformly been allowed to defeat the title of a holder of negotiable paper.. "Where the paper has been transferred as collateral security for a usurious debt, the incident falls with its principal; and, as the debt is illegal and void, no title to the collateral is acquired, which can exclude the equitable rights of third persons. This class of eases is well illustrated by those cited in-argument. In the ease of Ramsdell v. Morgan [supra), goods fraudulently obtained from the plaintiff, were pledged by the *402 vendee as collateral security for a usurious advance upon them by an auctioneer; and the court held that the usury might be shown, and his title defeated, in an action of trovei brought by the party defrauded, although the auctioneer was wholly ignorant of the fraud. In Dean v. Howell, Hill & Dennio Rep. 89, a promissory note, invalid as between the original parties, was transferred as collateral security for a usurious debt, and the same ruling was made. The court, after referring to the elements necessary to constitute a Iona fide holder, say: “ To affirm that the transaction in question was such, and that this note passed in the ordinary course of trade, would be a slander upon the mercantile community. There are devices enough for covering up and saving men against the legal consequences of usury, without adding this to the -catalogue.” But it is quite unnecessary to pursue this subject further, as no pretense is made that there was anything of a collateral character in this transaction; and, upon the whole, we can not find that it was obnoxious to the usury laws of the State of New York.
And this brings us to the question, whether, upon the facts found as to the consideration paid by him, Smith can be regarded as having taken the note in the usual course of business, and holding it for value in the sense of the commercial rule. Yarious expressions have been used by different judges upon this subject. It is sometimes said that the holder must have parted with, full value, sometimes, fair value, and, sometimes, the expression, “ for value,” only is used; but, in no case, which has fallen under our observation, has the doctrine been subjected to a precise and clear definition. The extremes of judicial opinion, in the subordinate courts of New York, are illustrated by the cases of Gould v. Lessee, 5 Duer, 260, .and Hall v. Wilson, 16 Barb. 548. In the first of these cases, it is said that, “ when a parting with value is proved, the .amount of the consideration is not otherwise important, than .as bearing on the question of actual or constructive notice; ” while in the last, Allen, J. expresses the opinion that the rule requires, “ that the consideration of the transfer must be full ’■and fair, as well as valuable; ” and, as this was said in a case *403 where only five dollars was discounted from a note for one hundred and twenty dollars, it tends to the conclusion that he intended bj full value, the face of the paper. The point, however, was not necessarily involved in the decision of either case, and they are not otherwise important, than as showing that different opinions are entertained there, as they may be elsewhere, upon the subject. But, there is very little difficulty in saying, that the rule does not require the full face of the paper to be paid. No decision, to that effect, has ever been made, and the strongest expressions customarily used, do not import anything more, than that the holder must have given for the paper, what it was reasonably and fairly worth. To hold otherwise, would be to deprive all paper, for any cause not worth its face, of one of the most essential and valuable incidents of negotiability, and, most effectually, to stop its circulation. A moment’s reflection will satisfy any one, how deeply and disastrously such a holding would affect the business and commerce of the country.
But I am equally well satisfied, that such a consideration merely, as will uphold the transaction, between the parties to the transfer, will not necessarily avail to exclude a defense of the maker or acceptor, or to cut off the equitable rights which third persons may have to the paper. I fully concur in the doctrine laid down by Chancellor Kent, in Bay v. Coddington, 5 Johns. Chy. R. 58. He says : “ I have not been able to discover a case in which the holder of negotiable paper, fraudulently transferred to him, was deemed to have as good a title, in law or equity, as the true owner, unless he received it not only without notice, but in the course of business, and for a fair and valuable consideration given or allowed on his part, on the strength of that identical paper. It is the credit given to the paper, and the consideration bona fide paid on receiving it, that entitles the holder, on grounds of' commercial policy, to such extraordinary protection, even in cases of the most palpable fraud. It is an exception to the general rule of law, ..and ought not to be carried beyond the necessity that created it.” I also concur in the able opinion of Swan, J. in Roxborough v. Messick, 6 Ohio St. Rep. 451, that “ the necessities *404 of the commercial world require that hills of exchange and. promissory notes should possess some of the attributes of money and exchangeable value,” and that for this purpose, “ it is necessary to protect them in the hands of a holder for value* from defenses growing out of the dealings of the prior parties.” But, as is said by him, “ the rule frequently operates harshly and unjustly, and being founded on commercial policy, is, therefore, applicable only where the interests of trade require it;” and “if the holder has not taken the paper for value, or in the usual course of trade, or in ignorance of the-defects, he stands in no better situation than the indorser from whom he received it.” It is thus made very apparent, that the rule is established for defined objects and specified purposes ; is an exception to the general rule governing choses in action; and can only be invoked when the instrument has-been used in the usual course of trade, to effect an exchange of values, and in accordance with the customary rules governing such transactions. The object of the rule, and the necessity out of which it arises, should furnish the ruling principle for its application. Resting -originally upon the mere custom, of merchants, and confined to paper acquired in the prosecution of the particular business of the holder, it has grown to. be a rule of commercial law, founded on the policy of aiding and protecting honest commerce, by furnishing it with a convenient medium for exchanging its values; but, to extend it to cases where the usual rules of trade have not been regarded, and the paper- has been acquired without any reference to its value in commerce, would be to foster speculation, instead of commerce, and to deprive parties of the rights which they would otherwise have, without promoting any public policy whatever. The ground upon which the rule has always been defended, very clearly shows that it can have no application to such cases. Proceeding upon a principle of very wide application in the law, it is said, that the equities of the holder are equal to those of the maker, or real owner, and that there is, therefore, no reason for depriving him of the benefit of the legal title — a position which is maintained with difficulty,. *405 where the one has ten .times the amount involved that the other has.
It may not be practically very material whether the title of such a holder is defeated, by using this consideration as a circumstance of suspicion sufficient to put him upon inquiry, or whether it deprives him of the benefit of having obtained the paper “ in the usual course of trade,” or is, in and of itself an independent element in the commercial rule. I am, yet, strongly inclined to the opinion, that an unimpeachable title is -only acquired when a fair and reasonable price is paid for the paper, and that where the consideration is grossly inadequate to its market value, the equitable rights of third person cannot be excluded. I state this, as my own opinion, to avoid misapprehension in saying that the face of the paper need not be paid, and to elicit further inquiry upon an important-question of commercial law.
But no rule, which it is admissible to adopt, can reach this case, in its present position. As. we have already stated, the evidence upon which the issues were found in the court below, is not before us; and it is impossible now to say that the facts were not found upon- sufficient proof. It may have been shown that a fair value, under all the circumstances, was given for this paper; and, if necessary to sustain the finding, we should be bound to presume that it was so shown. The result is, that there is no error apparent upon the record in the finding of the court, that a sum of money was due upon the note from Baily to Smith; and the fact that it was not enforced for the full amount, whether correct or not, lays no foundation for complaint by Baily.
2. The remaining question is one of much importance, and for the first time presented in this court. As it was supposed to be involved m other cases upon our docket, we have given opportunity to counsel in those cases to be heard, and after full argument, we have bestowed upon it very careful attention. Does the fact that a note, obtained by fraud, has passed .into the hands of a Iona fide indorsee, entitle him to enforce .a mortgage, given to the original holder, to secure its payment ? Or may the mortgagor still insist upon the fraud, as *406 a defense to an action brought to foreclose it ? On the one-hand, the question is in no way affected by the further question, whether a mortgagee acquires such an interest in the-land as to enable his grantee, being also assignee of the note,by deed duly executed, to claim the benefit of the rule which protects bona fide purchasers of real estate — there being no-claim that any such deed was made? And on the other, we assume, as undoubted, that, whether a written assignment was made or not, the assignee of the note acquired all the rights- and interests of the assignor, in the mortgage. Very little aid is to be derived, either from adjudged cases or the elementary books, in the solution of the precise question now before us. This is not because the purchase and assignment of mortgages, is a new thing. On the contrary, scarcely any business transaction has been more common and familiar, or has oftener engaged the attention of the courts. Nor has the nature of this instrument, and the rights of parties growing out of its assignment, either alone or in connection with a non-negotiable security, escaped attention, or failed to receive very full and accurate illustration. In such case, the universally acknowledged doctrine, from the case of Davies v. Austin, 1 Ves. 247, to Bush v. Lathorp, 22 New York R. 535, has been, that it is to be regarded as a chose in action, and, as expressed by Lord Thurlow, “ the purchaser must abide by the case of the person from whom he buys;” but during all that long period, neither in England, nor-in any of the old states of the Union, does the question seem to have been presented, whether it might not have a different effect- upon its assignment, when made to1 secure a negotiable instrument. This may be accounted for, in part, undoubtedly by the general practice of taking a non-negotiable bond with a mortgage; but it can not be doubted that mortgages have many times been taken to secure negotiable bills and notes, fraudulently transferred, and if such a distinc- ■ tion was thought to exist, it seems very singular that the holdersshohld never have made the attempt to avail themselves of such, securities. In New York, the attempt has been frequently made to confine the principle, that the purchaser must abide by the-case of the seller, to the original debtor, allowing him to make *407 the same defense against the assignee that he could against the assignor, but protecting the assignee, without notice, from what have been denominated latent equities, or interests in third persons, not in the apparent chain of title. And this for the very plausible reason, that one proposing to purchase such an instrument, might inquire of the debtor whether he pretended to any defense, and make his answer estop him from afterward asserting any, but that no amount of diligence would enable him to protect himself from such latent equities. But, after some vascillation in judicial opinion, the court of appeals, in Bush v. Lathrop, repudiated the distinction, and held, that the purchaser, in such cases, must rely upon the good faith of the seller, that he could “ take only such title as the seller had and no other,” and that if 'mortgages were “ to be further assimilated to commercial paper, the legislature must so provide.”
But the direct question arising upon mortgages given te secure negotiable paper, has arisen in two of the new states of the west, whose courts are entitled to high respect for their learning and ability, and it has there been held, that the quality of negotiability is so far imparted to such mortgages, as to-make them available in the hands of a bona fide indorser of the paper, without any regard to the equitable rights of the original parties. Reeves v. Sently, Walker’s Ch. Rep. 248; Dutton v. Ives, 5 Michigan Rep. 515 ; Fisher v. Otis, 3 Chand. Rep. 83; Martineau v. McCollum, 4 Id. 153; Croft v. Bunster, 9 Wisconsin Rep. 503. In the first of these cases, decided by the chancellor of Michigan, in 1843, no reasons are assigned, or authorities cited; and in Dutton v. Ives, decided by the supreme court, in 1858, the doctrine is again advanced upon the authority of Reeves v. Sently, and the two Wisconsin cases, reported in 3 and 4 Chandler. On referring to the first case decided in that state (Fisher v. Otis), we find it professedly based on authority, and it serves to show upon what a slender foundation, a line of decisions may be made to rest. The court say: “ This doctrine is sustained by respectable authorities, and by the reason and sound policy which have long ruled in relation to commercial paper;” and Powell on *408 Mortgages, 908, and note are cited. Mr. Powell certainly did suggest the question, whether such a distinction might not be made. His exact position is thus stated by Mr. Coventry in the note: “ When it is said that a 4eht is not assignable at law, it must be understood with this restriction, that if it be secured by a negotiable instrument, such as a bill of exchange, the legal interest will pass by indorsement, and this has induced the learned author, in the next paragraph of the text, to suggest, whether, in such a case, the rule as to the mortgagee’s liability would apply.” The rule here referred to, is that announced by Lord Loughborough, in the leading case of Matthews v. Wallwyn, 4 Ves. 126, that the assignee of a mortgage takes it subject to all equities which could be asserted against his assignor. Now, it may be fairly assumed, that Mr. Powell supposed that such a distinction could be judiciously made; but it must be admitted that he had then no authority to base it upon, that neither the judicial records of England, nor of any of the old states, furnish any evidence that it has ever been adopted, and that it was first acted upon, nearly half a century after the suggestion was made, by a new state upon another continent. Under such circumstances, it can not be reasonably claimed, that we are at liberty to regard it as an established principle, and we can only adopt it when we are convinced that it is correct in principle, and consistent with the analogies of the law. The reasons for supposing it to be so, are well stated m the case of Croft v. Bunster, 9 Wis. Rep. 510. The reason assigned, it is said, why the assignee can recover no more in equity than is actually due from the mortgagor to the mortgagee, is, that he could recover no more at law on the bond or covenant, and the reason ceasing as to negotiable securities, the rule also ceases to have application ; that the debt is the principal thing, and the mortgage the mere incident, following the debt wherever it goes, and deriving its character from the instrument which evidences the debt. To which may be added, the consideration pressed upon our attention in argument, that, if a recovery may be had for the debt, the mortgagor can have no interest in withdrawing the mortgaged property from liability to satisfy it. This last *409 position is easily disposed of. If it were true, it would fur' nish no authority for changing the legal character and incidents of the mortgage deed, and, it is evident, that other lien-holders would often have a deep interest in the question. But it is not true as to the mortgagor. The right to dispose of property at the will of the owner, and to pay honest debts instead of those tainted with fraud, are valuable privileges, of which he -should not be deprived without a necessity exists; and a decree upon the mortgage would very often deprive him of the benefits of the homestead law, which could not be effected by a judgment upon the fraudulent note. It is very evident also, that the wife of the mortgagor, in a large majority of cases, might have a deep interest in the solution of this question. Wholly incapable of becoming a party to any commercial contract whatever, she may nevertheless convey her estate, or release her dower, by way of mortgage for the security of her husband’s negotiable paper. If the mortgage is to be deemed negotiable in the hands of an assignee of the paper, we see no escape from the conclusion, that the mortgage must be enforced against her, however gross and palpable the fraud may be, by which it was obtained.
In a general sense, it may be very well and very correct, to speak of a mortgage as an incident to the debt it is created to secure; but the importance of this mere term may be easily overrated. It certainly is not one of- the incidental effects of. the creation of the debt itself, and it can only be made to have relation to the debt by the force of the contract contained in the mortgage; and is incident to the debt only in the same sense, that every independent contract, having for its object the payment or better security of the debt, is incidental to it. The existence of the debt, is the occasion out of which they arise, and the subject of their various provisions; but they embrace all the elements of a perfect contract in themselves, and are enforced by appropriate remedies, according to their own stipulations. At law, a mortgage effects the conveyance of an estate upon condition, but in the view of a court of equity, where alone the rights of an assignee can be enforced, it is a chose in action, having no negotiable quality, and not *410 differing in character from collateral personal agreements, designed to effect the same object. Any of these collateral agreements may be entered into for the purpose of securing a debt,, evidenced by a negotiable instrument; and if they are not obtained by fraud, and rest upon a sufficient consideration, in the-absence of any agreement to the contrary, they undoubtedly enure in equity to the benefit of any owner of the debt. But the, question here is, whether one of these collateral agreements, made to secure a negotiable note, loses its character of a mere chose in action, and has imparted to it the qualities-of negotiability, so that upon the transfer of the note, it maybe enforced, although obtained by fraud ? This question has been repeatedly answered, in respect to a class of collateral agreements, much more intimately connected with the negotiable instrument, than is the mortgage deed. We refer to guarantees indorsed upon the note itself. Passing by those which have been claimed to be such, but held by the courts to be mere indorsements, or original contracts, with apt words of negotiability incorporated in them, the universal doctrine'has been, that the legal title does not pass upon the transfer of the note; that they are mere non-negotiable choses in action, and to be treated, in every respect, as such. Lamorieux v. Hewit, 5 Wend. 307; McLaren v. Watson’s Executors, 26 Wend. 425; Miller v. Gaston, 2 Hill, 188. In the first of these cases, Chief Justice Savage, says: “ Promissory notes are negotiable only by virtue of the statute, but this negotiable quality is not extended to any other instrument relating to the note;” and Bronson, J., in the last, in support of the same position, says: “ But the guarantee itself is not a negotiable instrument, and can not be transferred to a third person so as to give him a legal title to proceed in his own name against the guarantor. As in the case of other contracts-which are not in their own nature assignable, the remedy upon a guarantee is confined to the original parties to the instrument.” We have said that these instruments are much more intimately connected with the note, than is a mortgage deed. This will be apparent when it is remembered, that the one ordinarily guarantees the particular instrument specified in it, *411 and does not survive a renewal or other change of the evidence of indebtedness; while the other secures the debt, whatever changes may intervene, until it is paid; and, even a positive statutory bar which precludes a recovery upon the note, it has been held, does not prevent the enforcement of the mortgage. Fisher v. Mossman, 11 Ohio St. Rep. 42.
In order to sustain the judgment rendered in this case, it is indispensably necessary to affirm — either, that the mortgage, when made to secure a negotiable note, contrary to its general nature and qualities, becomes a negotiable instrument, or, that the transfer of such a note, without the aid of any statute, or of any judicial decision, except those of very recent date, has an effect beyond the note itself, and draws after it, and within, one of the most important incidents of negotiability, a collateral contract having relation to the same debt. A very careful, consideration of the whole subject, has convinced us that we have no power to do either; and that neither justice nor public policy would be promoted by making the attempt. It certainly has never been thought to be within the province of a eourt, to determine what instruments should be taken from the list of mere choses in action, and clothed with the attributes of negotiability. Bills, foreign and inland, assumed this position upon the immemorial custom of merchants, and were adopted into the law, upon the reasons which availed to make' up the great body of the common law. But the statute, third and fourth Anne, was found necessary to place promissory notes upon the same footing; and from that day to this, neither in England nor in this country, has an instrument been added,, without express legislative sanction. Indeed, this could not well be otherwise. The necessities of commerce, and the instruments best calculated to answer its purposes, must all be considered before any intelligent decision coüld be made.. These are legislative functions, requiring experience and extensive information, and calling for the exercise of a discretion, wholly incompatible with the fixed certainty of judicial decision. But if it were otherwise, and the discretion rested, with us, we could not introduce the mortgage deed into the list of negotiable instruments, without disregarding the very *412 .foundation principles upon which such paper has always been ■ supposed to rest. From the case of Miller v. Race, 1 Burr. R. 452, to the very latest case in our own reports, the lan guage of the courts has been uniform, that such paper is only allowed in the interests of commerce, and “ possessing some of the attributes of money,” to answer the purposes of currency. Lord Mansfield, in answer to the “ingenious” argument of Sir Richard Lloyd, that the plaintiff could take nothing by assignment from a thief who had stolen the paper, said the •fallacy of the argument consisted in comparing bank notes to what they did not resemble. “ They are not goods,” he said, “not securities, nor documents for debt, nor are so esteemed; but are treated as money, as cash, in the ordinary course and transaction of business, by the general consent of mankind;” ■“¿7m course of trade creates a property in the assignee or bearer,” and they can not be recovered “ after they have been paid away in currency, in the usual course of business.” This was said, it is true, of bank notes; but the same principles, .and for the same reasons, were afterward applied by the same learned judge, to every description of negotiable paper, and the case of Miller v. Race is still the leading authority upon this branch of commercial law.
Now, mortgages are not necessities of commerce, they have •none of the “ attributes of money,” they do not pass in currency in the ordinary course of business, nor do any of the prompt and decisive rules of the law merchant apply to them. They are “ securities,” or “documents for debts,” used for the purposes of investment, and unavoidably requiring from those ■who would take them with prudence and safety, an inquiry into the value, condition and title of the property upon which they rest; nor have we the least apprehension that commerce will be impeded by requiring the further inquiry of the mortgagor, whether he pretends to any defense, before a court will foreclose his right to defend against those which have been ■obtained by force or fraud.
Against any amount of mere theory, advanced to sustain the position that commerce requires these instruments to be invested with negotiable qualities, may be successfully opposed *413 the stubborn fact, that in the first commercial country of the ■ world, as well as in the great commercial states of the Ameri ■ can Union, they have never been used for such purposes, or heard of in such a connection. It is quite immaterial whether this has arisen from the cause supposed — that they are never made to secure negotiable paper — or not; since it equally shows that no necessity for their use has ever been felt. A long experience has demonstrated, that they are not necessary instruments of active trade and business; and we but follow in the footsteps of the ablest and wisest judges, when we say,, that the harsh rule which excludes equities, and often does injustice for the benefit of commerce, should not be applied to them. This remits them to the position they have so long occupied — that of mere choses in action; and whether standing alone, or taken to secure negotiable or non-negotiable paper, they are only available for what was honestly due from the mortgagor to the mortgagee. If they are assigned, either expressly or by legal implication, the assignee takes only the interest which his assignor had in the instrument — acquires but an equity, and, upon the long-established doctrine in courts, of equity, is bound to submit to the assertion of the prior equitable rights of third persons. To hold otherwise, is to engraft legal incidents upon a mere equitable title; to give to-the transfer of negotiable paper an effect beyond what it imports, or is necessary in the accomplishment of its legitimate-purposes; and, finally, to invest with negotiable qualities a class of instruments, neither used for, nor adapted to, the trade and commerce of the country, and thereby to deprive the mortgagor of the just right of defending against fraud, without subserving any public policy whatever.
These views necessarily lead to the conclusion, that, upon the facts found in the court below, the plaintiff was entitled to have his title cleared from the incumbrance of this fraudulent mortgage, and that the court erred in giving the affirmative judgment of foreclosure in favor of Smith. Eor this error, - that judgment is reversed, and the cause remanded for further proceedings.
*414 Peck, C J., and Brinkerhoee, Scott and Wilder, JJ., concurred.